# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-DP-00419-SCT

*MACK ARTHUR KING*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/28/2003 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES E. ROCAP, III |
| | MICHAEL R. FARROW |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED-5/31/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     This case comes to this Court from Mack Arthur King's resentencing trial for the August 3, 1980, capital murder of Lela Patterson. On December 5, 1980, Mack Arthur King was found guilty of capital murder and sentenced to death. On October 27, 1982, the Court affirmed both the conviction and the sentence. *King v. State*, 421 So. 2d 1009 (Miss. 1982). A timely petition for rehearing was filed and later denied by this Court on December 1, 1982.

*Id.* On May 2, 1983, the United States Supreme Court denied King's petition for writ of certiorari. ***King v. Mississippi***, 461 U.S. 919, 103 S. Ct. 1903, 77 L. Ed. 2d 290 (1983). We denied his subsequent Application For Leave to File a Petition for Writ of Error Coram Nobis in the Circuit Court of Lowndes County but later ordered that court to conduct a hearing regarding King's claim of ineffective assistance of counsel. *See **King v. Thigpen***, 441 So. 2d 1365 (Miss. 1983); ***King v. Thigpen***, 446 So. 2d 601 (Miss. 1984). The circuit court conducted a hearing on the matter and found that counsel had rendered effective assistance. We affirmed the trial court's denial of relief on February 18, 1987. ***King v. State***, 503 So. 2d 271 (Miss. 1987). King then filed a petition for writ of habeas corpus with the United States District Court for the Northern District of Mississippi. The district court denied relief. On August 25, 1993, the Fifth Circuit vacated the sentence of death and remanded the case with instructions to return to the state court for reconsideration of the sentence of death in light of ***Clemons v. Mississippi***, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990). ***King v. Puckett***, 1 F.3d 280 (5th Cir. 1993).

¶2. This Court vacated the sentence of death and remanded for a new sentencing trial. ***King v. State***, 656 So. 2d 1168 (Miss. 1995). On April 9, 1998, King was again sentenced to death. On July 1, 1998, King's motion for new trial was denied, from which he appealed to this Court. On April 19, 2001, this Court reversed the death sentence and remanded for a new sentencing hearing on the ground that the trial judge committed reversible error by commenting that the jury should disregard, in toto, sympathy in its deliberations. ***King v. State***, 784 So. 2d 884 (Miss. 2001). On March 23-28, 2003, the trial court held the resentencing hearing which is the subject of this appeal. The jury returned a sentence of

death.  From that judgment King now appeals, raising eleven assignments of error which we

recite verbatim.

I. **THE TRIAL COURT IMPROPERLY DENIED KING'S MOTION FOR FUNDS TO OBTAIN EXPERT ASSISTANCE.**

II. **THE TRIAL COURT ERRED BY FAILING TO FOLLOW CONSTITUTIONALLY REQUIRED PROCEDURES TO DETERMINE WHETHER KING WAS MENTALLY RETARDED.**

III. **THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING KING'S MOTION TO CHANGE VENUE.**

IV. **THE TRIAL COURT ERRED IN DENYING MR. KING'S MOTION TO EXCLUDE THE DEATH PENALTY AS A SENTENCING OPTION BECAUSE KING'S INDICTMENT WAS DEFICIENT.**

V. **THE TRIAL COURT ERRED IN DENYING KING'S MOTION TO EXCLUDE THE DEATH PENALTY BECAUSE OF (A) 22-YEAR INCARCERATION ON DEATH ROW AND (B) UNAVOIDABLE JURY BIAS.**

VI. **THE TRIAL COURT ERRED BY STRIKING JURORS BASED UPON THEIR VIEWS OF THE DEATH PENALTY.**

VII. **THE TRIAL COURT ERRED IN DENYING KING THE OPPORTUNITY TO PRESENT EVIDENCE AND CHALLENGE THE STATE'S EVIDENCE REGARDING THE IDENTITY OF LELA PATTERSON'S ACTUAL KILLER.**

VIII. **THE TRIAL COURT ERRED IN ALLOWING IMPERMISSIBLE VICTIM IMPACT TESTIMONY HIGHLY PREJUDICIAL TO KING AT THE RE-SENTENCING HEARING.**

IX. **THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE AGGRAVATOR "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL," AND THERE WAS INSUFFICIENT EVIDENCE OF THE AGGRAVATOR, IN VIOLATION OF THE UNITED**

**STATES AND MISSISSIPPI CONSTITUTIONS AND THIS COURT'S SPECIFIC MANDATE.**

**X.    THE TRIAL COURT'S JURY INSTRUCTIONS WERE IN ERROR.**

**XI.    THE AGGREGATE OF THE ERRORS IN THIS CASE REQUIRES REVERSAL OF THE DEATH SENTENCE.**

¶3.    After a thorough review of these issues, we find no error and accordingly affirm the trial court.

## FACTS

¶4.    The undisputed facts of this case were clearly and succinctly set forth by this Court in **King v. State**, 421 So. 2d 1009, 1010-1011 (Miss 1982).  This Court's opinion was stated as follows:

About 10:30 a.m. on August 3, 1980 Mrs. Lelia[1] Patterson was found dead in a bathtub in her home. An investigation revealed that the screen on a door had been cut, the telephone wires outside the house had been severed, articles were scattered throughout the house, and dresser drawers had been emptied on the floor. A fingerprint and palmprint were found on two file folders in a box located in the house. The prints matched known fingerprints and palmprints of [King]. [King]'s residence was searched two days later and several items which belonged to Mrs. Patterson were found. [King] was arrested on August 6th and denied that he had been at Mrs. Patterson's house on August 3rd. The officers interviewed [King]'s girlfriend, Barbara Jordan and on the basis of information received from her, [King]'s residence was searched a second time and additional items from Mrs. Patterson's home were found.

[King] was questioned after the second search and admitted that he entered the house of Mrs. Patterson on Saturday night, August 2nd, burglarized the house, saw Mrs. Patterson, but did not kill her. In his second statement he said he was accompanied by Willie Porter who remained outside while [King] burglarized the house, that Mrs. Patterson was alive when he left the house, and that Willie

_____

[1]Although this Court previously referred to the victim as Lelia, her correct name was Lela.

4

Porter entered the house as he was leaving. [King] also said he saw Willie later in the morning of August 3rd and Willie told him that he, Willie, had taken some articles from Mrs. Patterson's house.

After signing the second statement, [King] agreed to another search of his premises and told the officers where to find additional items stolen from Mrs. Patterson which were hidden near his house.

According to Barbara Jordan, [King] showed her some of the articles he had stolen but did not tell her where they came from. She testified that [King] was wearing green pants on Saturday, August 2nd and Sunday, August 3rd which were confiscated by the police. On Tuesday [King] washed the pants after refusing to let the witness wash them as was customary. Human blood was found on the pants but not in a sufficient amount to ascertain the blood type.

The pathologist who performed the autopsy on Mrs. Patterson's body testified that she had multiple bruises about her neck, face, and arms, a laceration on the back of her head, and water in her lungs. In the opinion of the pathologist Mrs. Patterson had been manually strangled, struck on the back of the head with such force that it caused edema of the brain, and had been under water while she was either conscious or unconscious. He was unable to ascertain the order in which the events occurred, but stated if the manual strangulation took place first, then the victim could have regained consciousness, but if the trauma to the skull occurred first, she possibly never regained consciousness. Mrs. Patterson's death could be attributed to either strangulation, a blow to the head, or drowning. The findings of the pathologist show conclusively that Mrs. Patterson was brutally murdered.

*Id*.

## DISCUSSION

¶5.    "On appeal to this Court, convictions of capital murder and sentences of death must be subjected to what has been labeled 'heightened scrutiny.'  Under this method of review, all bona fide doubts are to be resolved in favor of the accused because what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." ***Balfour v. State***, 598 So. 2d 731, 739 (Miss. 1992).

5

## I. WHETHER THE TRIAL COURT IMPROPERLY DENIED KING'S MOTION FOR FUNDS TO OBTAIN EXPERT ASSISTANCE.

¶6.     King asserts that the trial court committed error when it improperly denied his Motion For Funds To Obtain Expert Assistance without providing legal or factual reasoning.  King relies on United States Supreme Court decision *Ake v. Oklahoma*, 470 U.S. 68, 76; 105 S. Ct. 1087, 1093; 84 L. Ed. 2d 53, 62 (1985) to support his assertion that the trial court's refusal to grant his motion rendered his trial fundamentally unfair, thereby depriving him of due process of law.  The State counters that King's reliance on *Ake* is misplaced, as *Ake* requires the provision of psychiatric assistance to a capital defendant when the State is going to use psychiatric evidence against him in the sentence phase of the trial or when the insanity defense is raised, neither of which occurred in this case.

¶7.     In *Ake*, the United States Supreme Court stated:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, *see Ross v. Moffitt,* 417 U.S. 600 (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system," *id*., at 612.

> . . . .

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive

6

funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

*Ake*, 470 U.S. at 77, 83.

¶8.     This Court has held that "[t]he trial court's decision on a motion for funding for consultants or investigators for an indigent defendant is reviewed for abuse of discretion." *Grayson v. State*, 806 So. 2d 241, 254 (Miss. 2001) (citing *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991)). This Court addressed this right as implemented in Mississippi in *Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994), by holding that "[t]his Court weighs on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial and will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair." *Id.,* (*quoting Johnson v. State*, 529 So. 2d 577, 590 (Miss. 1988)).

### A.     Independent Expert Pathologist

¶9.     King asserts that the trial court erred in denying him funds to retain an independent expert pathologist. Citing *Ake* with regard to whether a court is required to pay for an expert witness for an indigent defendant, King argues that he had a "uniquely compelling" private interest in the accuracy of his sentencing hearing because his life was at stake. *Ake*, 470 U.S. at 77. King asserts that the testimony of Dr. Ben Martin, the pathologist who performed the autopsy on Patterson, was the primary evidence offered by the State to prove the "especially heinous, atrocious or cruel" aggravation circumstance. King specifically points

7

out Dr. Martin's testimony that Patterson may have remained conscious while she was strangled and drowned. King also cites this Court's statement in his previous appeal that whether Patterson was conscious during the strangulation and drowning was a significant question in determining whether the crimes was heinous, atrocious or cruel. *King*, 784 So. 2d at 888. King argues that Dr. Riddick, an independent expert pathologist, could have provided strong competing testimony by identifying specific errors in Dr. Martin's procedures and substantive findings, and thus due process and fundamental fairness required the trial court to allow King access to an independent pathologist. King argues that he satisfies the standard set by this Court in *Harrison* for relief from denial of funds, as the affidavit of Dr. Riddick gave concrete reasons that assistance would be beneficial. *Harrison*, 635 So. 2d at 901. Conversely, the State argues that King has not offered anything more than "unsubstantiated assertions" that he would have benefitted from expert assistance. As such, the State argues that King is not entitled to relief under *Harrison* because he has not shown that he has suffered any prejudice as a result of the trial court's denial of funds.

¶10. This Court previously addressed this very issue in King's last direct appeal. In holding that the trial court's denial of funds did not require reversal of the death sentence, we stated:

> The State called an expert, Dr. Ben Martin, who testified that Patterson was conscious when she was killed. Dr. Martin testified to specific procedures used to show how he came to his conclusion that Patterson was conscious. Dr. Martin further testified that Patterson's head injuries were the result of multiple blows to the head. King was denied his own expert to rebut this testimony.

8

A defendant is entitled to an expert to rebut expert opinion on "crucial elements." ***Ake v. Oklahoma***, 470 U.S. 68, 77, 105 S. Ct. 1087, 1093, 84 L. Ed. 2d 53 (1985). A fundamental question to be answered, however, is whether King has shown a "substantial need" for expert assistance. *"Mississippi case law states expert assistance should be granted upon a showing of substantial need."* ***Holland v. State***, 705 So. 2d 307, 333 (Miss. 1992) (*quoting* ***Butler v. State***, 608 So. 2d 314, 321 (Miss.1992)). "'Undeveloped assertions' of helpfulness to the defense are insufficient to show that need." **Id.** (*quoting* ***Hansen v. State***, 592 So. 2d 114, 125 (Miss. 1991)).

The crucial issue here was whether the crime was heinous, atrocious, or cruel. Thus, whether Patterson was conscious during the strangulation and drowning becomes a significant question. Certainly, this is a "crucial issue" within the meaning we have given that term. *However, King can show no substantial need for his own expert witness since, upon cross-examination, Dr. Martin testified that Patterson may have been unconscious during the strangulation and drowning. Dr. Martin's testimony directly rebutted the State's argument and aided King in his defense. Consequently, King suffered no prejudice by not having a pathologist testify on his behalf. The error, if present, was harmless.*

***King v. State***, 784 So. 2d 884, 888-889 (Miss. 2001) (emphasis added). At the 2003 re-sentencing trial, Dr. Martin testified that Patterson could have retained consciousness for ten to twenty minutes, depending on whether she was struck on the head or strangled first. However, on cross-examination, King's counsel refreshed Dr. Martin with a copy of his 1980 testimony and extensively questioned him concerning Patterson's consciousness and whether strangulation was the primary cause of death. Dr. Martin testified that Patterson may have retained consciousness, but it is also possible that she may have lost consciousness from the blow to the back of her head, and possibly never regained it. Further, in response to questioning by the defense concerning whether manual strangulation could render a person unconscious within a period of thirty seconds,[2] Dr. Martin stated that it is possible. After

---

[2] Dr. Martin prefaced his response by saying he did not have experience to say whether manual strangulation could render a person unconscious within 30 seconds, but he

reviewing Dr. Martin's testimony, we conclude that King has not shown the required substantial need to obtain independent expert assistance because Dr. Martin's testimony on cross-examination rebutted the State's argument. *Holland,* 705 So. 2d at 333.

¶11.    Additionally, in his affidavit, Dr. Riddick opined that the State's investigation of the crime scene and the examination of Patterson are problematic for four reasons.  First, Dr. Riddick stated that there *appeared* to be insufficient evidence of some of the victim's injuries as well as whether she was conscious during the attack.  Next, he stated that some of the procedures performed during the autopsy were not proper.  Lastly, he said the investigation of the crime scene *appeared* to be inadequate, and *could have* caused post-mortem injuries to Patterson's body.  This lone paragraph offered by Dr. Riddick presents nothing in the form of *concrete reasons* that an independent expert would benefit King in his defense.  *Harrison*, 635 So. 2d at 901 (stating that "[o]f course a defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial.)  Rather, this constitutes an example of "undeveloped assertions" of helpfulness that we discussed in *Harrison* and *Holland*.  There is no merit to this issue.

### B.    Mental Health Expert

¶12.    First, King argues that the trial court's denial of a mental health expert prevented him from proving that his mental capacity made him ineligible for the death penalty.  *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (holding that the Eighth Amendment restricts the state from executing a mentally retarded offender).  King

---

would assume it was very possible.

argues that since he could not afford an independent expert to conduct the testing using the currently accepted standards and procedures, he was not able to investigate and present definitive evidence that he is mentally retarded at his re-sentencing. Dr. Robin King and Dr. Michael Whelan testified regarding the Intelligence Quotient ("IQ") tests conducted on King in 1983, in which both concluded that King had an IQ of 71.[3] However, Dr. King testified at the 2003 resentencing that he was made aware of a grading error on the Wechsler Adult Intelligence Scale-Revised (WAIS-R) which caused King's full scale IQ to fall from a 71 to a 69. Dr. King further testified that King tested as mentally retarded. Additionally, in his brief, King acknowledges that "the record contained substantial evidence, brought to the trial court's attention, establishing that King may be mentally retarded."

¶13.    King offers an affidavit by Dr. Caroline Everington in support of his motion for expert funds. In this affidavit, Dr. Everington states that based on her review of the record, "it is [her] preliminary opinion that there could be a basis to conclude that King is mentally retarded." She further points out that while King scored 71 on the WAIS intelligence tests, a complete social history and the use of the most current IQ test would enable us to more accurately ascertain whether King is, in fact, mentally retarded. After reviewing the evidence in the record and Dr. Everington's affidavit, we find that King has not shown the "substantial need" required to obtain funds for an independent expert. *Holland*, 705 So. 2d at 333.

---

[3]Dr. King testified that King's IQ of 71 could mean that he is mentally retarded. However, Dr. Whelan disagreed.

11

¶14. Alternatively, King argues that even if his mental condition does not bar the State from executing him, his level of mental functioning is relevant to the mitigating circumstances that a jury must consider under Mississippi law. King argues that, without expert assistance to offer opinions about his mental condition, he could not make an effective argument to the jury regarding this mitigating circumstance. Specifically, King points to extreme mental disturbance, extreme duress and substantially impaired capacity to appreciate the criminality of conduct or conform conduct to the law as the relevant mitigating circumstances listed in Miss. Code Ann. §99-19-101(6)(Rev. 2000). However, a review of the record reveals that the jury was presented with mitigating evidence covering all the relevant mitigating factors that King sought to show at trial. First, Dr. King testified to King's borderline intellectual functioning at his resentencing.[4] Therefore, the jury was presented with mitigating evidence of his mental capacity. Second, King's sister, Ethel Conner, testified to King's childhood, which King presented for the purpose of showing mitigating evidence of mental disturbance.[5] Conner also testified to King's relationship with his uncle Willie Porter, which was offered to show extreme duress based on King's theory that he was only a minor participant in the crime and acted under the influence of Porter. Specifically, Conner testified that Porter had a dominating relationship with King and that King had not been involved in any kind of criminal activity before Porter entered his life. Moreover, in his brief, King's primary argument is that he was not allowed to present

[4] *See infra* Issue II for a complete discussion of the evidence regarding King's level of mental functioning presented to the jury by Dr. King.

[5] *See infra* Issue II for a discussion of Conner's testimony regarding King's childhood.

mitigating evidence of his mental capacity because he was not granted independent expert assistance. However, as Dr. King testified to his mental capacity, we do not find that King was prejudiced by the denial of funds for an additional independent expert. As discussed above, King is not entitled to relief from the denial of funds for expert assistance, as he has not shown a substantial need for assistance under *Harrison* and *Holland.*

¶15. For these reasons, we find that the trial court did not abuse its discretion in denying King's Motion For Funds To Obtain Expert Assistance.

> **II. WHETHER THE TRIAL COURT ERRED BY FAILING TO FOLLOW CONSTITUTIONALLY REQUIRED PROCEDURES TO DETERMINE WHETHER KING WAS MENTALLY RETARDED**.

¶16. King asserts that the trial court failed to follow the proper procedures set forth by this Court in *Foster v. State*, 848 So. 2d 172 (Miss. 2003) and *Russell v. State*, 849 So. 2d 95 (Miss. 2003) to determine whether he was mentally retarded. Citing *Chase v. State*, 873 So. 2d 1013, 1023 (Miss. 2004), King argues that he is one of a "limited class of prisoners who filed their motions for an *Atkins* hearing prior to receiving procedural guidance from this Court." King argues that the evidence attached to his Motion to Determine Mental Retardation and to Preclude the Imposition of the Death Penalty was sufficient to meet the factual prerequisite for an evidentiary hearing under *Chase.* Further, King argues that the trial court's proceeding on the issue of mental retardation was wholly inadequate, as the procedures followed by the trial court failed to meet the *Chase* standards.

¶17. In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court held that the execution of mentally retarded inmates constitutes cruel and unusual punishment in

13

violation of the Eighth Amendment to the United States Constitution. The *Atkins* decision did not define who is or is not mentally retarded for purposes of eligibility for a death sentence but instead "leave[s] to the States the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17, 91 L. Ed 2d 335, 106 S. Ct. 2595 (1986)). This Court, in *Chase*, 873 So. 2d at 1029, established the following guidelines for determining mental retardation:

> We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that: 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association; 2. The defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

*Id. Chase* established the prerequisites to an *Atkins* hearing. The defendant must attach to his motion an affidavit from at least one qualified expert who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined IQ of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein. *Id.* King filed his Motion to Determine Mental Retardation and to Preclude the Imposition of the Death Penalty on March 20, 2003. However, as *Chase* was not handed down until May 20, 2004, the trial court did not have the benefit of guidance regarding *Atkins* hearings which this Court discussed in *Chase*.

14

¶18. Moreover, this Court, in *Lynch v. State*, 2007 Miss. LEXIS 34 (Miss. 2007), recently revisited the guidelines for determining mental retardation and eligibility for execution under *Chase.* This Court held:

> Accordingly, in Mississippi it is acceptable to utilize the MMPI-II and/or other similar tests. [*Chase*, 873 So. 2d 1013, 1029 (Miss. 2004)]. This Court did not intend by its holding to declare the MMPI-II or any one test as exclusively sufficient. Having a variety of tests at their disposal, courts are provided with a safeguard from possible manipulation of results and diminished accuracy which might result if courts are limited to one test. The United States Supreme Court mentioned the Wechsler Adult Intelligence Scales Test. *See Atkins*, 536 U.S. at 309 n.5. Other tests, as suggested by mental health experts, include the Structured Interview of Reported Symptoms (SIRS), the Validity Indicator Profile (VIP), and the Test of Memory Malingering (TOMM). *See* Douglass Mossman*, Atkins v. Virginia: A Psychiatric Can of Worms,* 33 N.M.L. Rev. 255, 277-78 (Spring 2003).

> The Court's interpretation in this case as to the proper test to be administered with regard to an Atkins hearing supercedes any contrary decisions. This Court neither endorses the MMPI-II as the best test nor declares that it is a required test, and decisions that state otherwise are expressly overruled. See, e.g. *Scott v. State*, 938 So.2d 1233, 1238 (Miss. 2006) (holding that despite the doctor's use of a battery of other tests, administration of the MMPI-II is required prior to an adjudication of a claim of mental retardation); *Goodin v. State*, 856 So.2d 267, 277 (Miss. 2003) (declaring that the MMPI-II is to be administered for a determination of mental retardation since it is the best test to detect malingering). *Our trial courts are free to use any of the above listed and approved tests or other approved tests not listed to determine mental retardation and/or malingering by a defendant.*

*Lynch*, 2007 Miss. LEXIS at *18-19. (Emphasis added).

¶19. Prior to the resentencing trial, the trial court ruled on King's motion. The record reflects that the district attorney, defense counsel and the trial judge were all keenly aware of *Atkins*. After weighing the evidence presented and taking into account *Atkins*, the trial court found that King was not mentally retarded under *Atkins* but left the issue open to allow the consideration of additional evidence on the issue which might be presented during the

15

course of the trial. A review of the record reveals that considerable evidence was presented to the trial court before it made its determination as to King's mental capacity. King attached to his motion transcripts of psychologists Dr. King's and Dr. Whelan's testimony regarding intelligence tests conducted on King in 1983, in which both concluded that King had an IQ of 71[6]. King also offered Dr. Everington's affidavit, in which she opined that there could be a basis to conclude King is mentally retarded. Dr. King testified that King was given the WAIS-R, the Wide Range Achievement Test and the Beery Buktenica Test of Visual Motor Integration in 1983. Based on these tests, Dr. King determined that King was in the lower range of borderline intellectual functioning and could be mentally retarded. Dr. Whelan administered the WAIS to King, as opposed to the WAIS-R, because at the time that Dr. Whelan administered the test, the revised edition was new and he preferred to use statistical correlations that were already established in the research. Dr. Whelan testified that he found King to be "below average" but not mentally retarded. Dr. King was also asked to review documents generated by King while incarcerated at the Lowndes County Jail.[7] Dr. King was asked if an individual who is mentally retarded as defined by the DSM-IV could generate such documents, which he opined would be highly unlikely. Dr. Whelan also reviewed these documents and opined that someone who is mentally retarded could not produce that type of written material without some assistance. At trial, Officer Jessie Brooks testified that he

---

[6]As previously noted, Dr. King testified that King actually scored a 69 on the WAIS-R and, in his professional opinion, tested as mentally retarded. However, Dr. Whelan disagreed with Dr. King's conclusion that King tested as mentally retarded.

[7] These documents included requests made by King pertaining to his stay at the Lowndes County Jail.

16

was familiar with King's handwriting and verified that these documents were produced by King. Brooks testified that on numerous occasions he actually saw King creating these documents in his room without assistance. At times, Brooks would wait until King was finished creating the document, then King would hand it to him. Brooks also testified that King used the law library on several occasions and had legal books in his cell.

¶20. The State also introduced Exhibit S-1 at the hearing on the motion, which contained the psychiatric evaluation of King by psychiatrist Dr. Dolores DiGaetano at the Mississippi Department of Corrections at Parchman. This evaluation was conducted in 1983 when King was 24 years old. This report evaluated King's social history and mental status. The report states that King has been arrested approximately ten times since he was six years old for various crimes. It also states that King had a negative medical and alcohol history. Regarding the mental status exam, Dr. DiGaetano concluded that King was a well-developed male with normal motor activity and speech. She found that he was concrete in his thinking, although unable to do simple mathematics. She further found that his insight and judgment were good. Her diagnostic impression was as follows: (1) rule out mental retardation; (2) no evidence of a personality disorder at this time; (3) no medical problems; (4) no known psycho social stress concerning his crime; and (5) fair functioning during the past year on Death Row. Additionally, King presented a screening report from King's evaluation by staff at the Mississippi State Hospital (Whitfield) in 1991. This report stated that King was of "dull normal mental standard" and included a scratched-out statement that King was "borderline MR [mentally retarded]." This evaluation also described King as "simple, literal,

17

concrete" and had a "simple facial expression." King also presented his school records.[8]

King called Sammy Townsend, custodian of school records for the Lowndes County Public School System, who testified that King had achieved poor grades during his short time in school.[9] However, on cross-examination, Townsend also testified that King had poor attendance in the school. King's sister, Ethel Conner, also testified at trial as to King's childhood. She testified to the poor living conditions in which they grew up, such as a house with no running water, one bedroom where all five children and parents slept in the wintertime, lack of food, the presence of alcohol in front of the children as well as frequent verbal disputes and physical violence by the parents in the presence of the children. Conner further testified that King missed a lot of school because he didn't have clothes and shoes to attend. She testified that his parents never encouraged his attendance nor did any school official. On cross-examination, Conner testified that despite growing up in the same rough conditions as King, she maintains employment and has raised children who received an education.

¶21. Although *Chase* had not been decided at the time of King's 2003 resentencing trial, we find that this hearing sufficiently complied with the procedures discussed in *Chase*. With respect to the procedure to be used in conducted such a hearing, this Court held:

> Having established the definition of mental retardation to be used for purposes of Eighth Amendment protection to mentally retarded defendants, we now turn to the procedure to be used in reaching a determination of mental retardation.

---

[8] There was a note on King's school records by Ms. Brownridge, King's third grade teacher, which stated that King could do the work if he would attend school regularly.

[9] King attended school only through the third grade.

18

We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:

1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;

2. The defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.

Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.

Thereafter, the State may offer evidence, and the matter should proceed as other evidentiary hearings on motions.

*At the conclusion of the hearing, the trial court must determine whether the defendant has established, by a preponderance of the evidence, that the defendant is mentally retarded. The factors to be considered by the trial court are the expert opinions offered by the parties, and other evidence if limitations, or lack thereof, in the adaptive skill areas listed in the definitions of mental retardation approved in Atkins, and discussed above. Upon making such determination, the trial court shall place in the record its finding and the factual basis therefor.*

*Chase*, 873 So. 2d at 1029. (Emphasis added). Here, both sides presented expert testimony and other evidence regarding King's mental retardation claim. After hearing all the evidence, which was substantial, the trial judge outlined the evidence that he had considered and gave his reasons for concluding that King was not mentally retarded.

19

¶22.   *Chase* merely affords a defendant a hearing if that defendant fulfills certain requirements.  King fulfilled those requirements and had his hearing.  For these reasons, we find that King was afforded a hearing on his mental retardation claim in satisfaction with the procedures outlined in *Chase*.  Therefore, we find no error with regard to this issue.

### III.   WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING KING'S MOTION TO CHANGE VENUE.

¶23.   King filed a Motion for Change of Venue prior to his most recent resentencing hearing.  As required by Section 99-15-35 of the Mississippi Code, King filed with this motion his sworn affidavit in which he stated that he could not receive a fair trial and impartial sentencing in Lowndes County, as well as supporting affidavits of two residents of Lowndes County.  At the hearing on this motion, the residents testified that King could not receive a fair trial based on the high level of media scrutiny of King's case.  King argues that he plainly satisfied the requirements of Miss. Code Ann §99-15-35 and presented prima facie evidence showing that a change in venue was necessary, which created a presumption in favor of change in venue.  Relying on *Fisher v. State*, 481 So. 2d 203, 215-216 (Miss. 1985), King argues that once he presented this prima facie evidence, the State failed to meet its burden of showing why a change in venue should not occur.   King asserts that since the State failed to rebut the presumption, it became automatic abuse of discretion for the trial court to deny his motion to change venue.  *McGee v. State*, 26 So. 2d 680, 683 (Miss. 1946)(*citing Gray v. State*, 799 So. 2d 53, 62-63 (Miss. 2001)).   Further, King argues that the presumption should have been deemed irrebuttable based on  the substantial media coverage coupled with two key factors: (1) the heightened standard of review in capital cases

and  (2) the fact that the crime was "committed by a black defendant upon a white victim."

*Id.*

¶24.   The State counters that King received a fair trial by jurors who were not influenced by past media coverage.  Specifically, the State asserts that the articles submitted by King did not create an irrebutable presumption for a change of venue, as the articles were either too distant in time to have any effect on the 2003 resentencing or were not printed near the area from which the venire was selected.  The State claims that the only locally-published newspaper articles offered as evidence were from the 1980 trial and the 1998 resentencing, which leaves too large a time gap to support a claim of prejudice.  The State argues that the more recent articles, the latest of which was dated April 23, 2001, came in the form of Associated Press and other wire stories, none of which were published locally during or immediately preceding the 2003 resentencing.  Additionally, the State claims that the trial court properly instructed and questioned the venire regarding their exposure to the publicity of King's case and received no response from any member of the venire.   The State cites *Swann v. State*, 806 So. 2d 1111 (Miss. 2002), to support its position that it rebutted the presumption that King could not receive a fair trial by proving that the trial court impaneled an impartial jury.

¶25.   The decision to grant a change of venue rests soundly in the discretion of the trial judge.  *Howell v. State*, 860 So. 2d 704,718 (Miss. 2004).  This Court will not disturb the ruling of the trial court where the sound discretion of the trial judge in denying a change of

venue was not abused. *Id.* In *Byrom v. State*, 927 So. 2d 709 (Miss. 2006),[10] this Court held that "[a] motion for a change of venue is not automatically granted in a capital case. There must be a satisfactory showing that a defendant cannot receive a fair and impartial trial in the county where the offense is charged." *Id*. at 715 (*citing* Miss. Code Ann. § 99-15-35 (Rev. 2000)). In *Davis v. State*, 767 So. 2d 986, 993 (Miss. 2000), this Court held that "[a] motion for a change of venue must be in writing and supported by affidavits of two or more credible persons showing that the defendant cannot receive an impartial and fair trial in that particular county because of prejudgment of the case or grudge or ill will to the defendant in the mind of the public." *Id.* at 718-719 (*citing* *Hoops v. State*, 681 So. 2d 521, 526 (Miss. 1996)) (internal quotations omitted). This Court thoroughly addressed the requirements for change of venue in *Howell*:

> The right to a fair trial by an impartial jury is guaranteed by both the federal and state constitutions. *Johnson,* 476 So. 2d at 1208 (citing U.S. Const. Amend. VI and Miss. Const. art. 3, § 26)). "The accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained." *Davis*, 767 So. 2d at 993 (citing *White,* 495 So. 2d at 1348). "Upon proper application, there arises a presumption that such sentiment exists; and, the state then bears the burden of rebutting that presumption." *Johnson*, 476 So. 2d at 1211.
>
> This Court enumerated "certain elements which, when present would serve as an indicator to the trial court as to when the presumption is irrebutable." *White*, 495 So. 2d at 1349. The elements are as follows:
>
> (1) capital cases based on considerations of a heightened standard of review;
>
> (2) crowds threatening violence toward the accused;

---

[10]While Byrom's claim is distinguishable from King's claim in that the Court found no record of a motion for change of venue, the opinion proceeded to address Byrom's claim and fully analyze the requirements for a change of venue.

(3) an inordinate amount of media coverage, particularly in cases of

(a) serious crimes against influential families;

(b) serious crimes against public officials;

(c) serial crimes;

(d) crimes committed by a black defendant upon a white victim;

(e) where there is an inexperienced trial counsel.

> *Id*.; *Davis*, 767 So. 2d at 993-94; *Baldwin v. State*, 732 So. 2d 236, 241 (Miss. 1999); *Burrell*, 613 So. 2d at 1189-90.

*Howell*, 860 So. 2d at 719.

¶26.    King offered the affidavits of James D. Dalrymple and Carrie Jourdan in support of his motion.[11] Dalrymple's testified as follows:

> Q.    When's the last time you read a newspaper article about the case?
>
> A.    It was probably in 1998, the second resentencing.
>
> Q.    So is it fair to say since '98, that resentencing, you've not seen a flood of publicity?
>
> A.    No.  I haven't seen a publicity.  No.

Dalrymple was then questioned by the defense, as follows:

> Q.    Mr. Dalrymple, have you seen anything this year or last year in the newspaper or media regarding Mack Arthur King's case being reversed and set for resentencing again?

---

[11]Only one witness, Mr. Dalrymple, testified at trial.   The parties stipulated that the testimony of the second witness, Ms. Jourdan, would be the same as Dalrymple's testimony.

A.     I remember reading an article in the newspaper regarding the case again coming back and it caught my attention because I was familiar with the case from the beginning.

Q.     And would the newspaper be the Commercial Dispatch?

A.     Yes.

¶27. Dalrymple contradicted his own testimony by stating that he had seen no recent publicity, specifically by stating that the last article he read was during the second re-sentencing in 1998, but then stating that he read a newspaper article regarding the case within the last year. After reviewing the record, we find thirteen articles submitted with King's motion for change of venue,[12] none of which is dated later than April of 2001. We find no local articles from 2001 or 2002, the years Dalrymple testified that he read an article in the Commercial Dispatch. Rather, the most recent local articles from the Commercial Dispatch were dated from 1998.

¶28. Looking at the factors outlined in ***Howell***, we do not find in this case the elements necessitating a change of venue. While this is a capital case under a heightened standard of review, that is but one element of the overall factors to consider in determining an irrebuttable presumption in favor of a change of venue. Further, King's argument that an irrebuttable presumption arose based on his race and that of the victim also fails. This Court in ***Howell*** stated this element as "an *inordinate amount* of media coverage, particularly in cases of . . .(d) crimes committed by a black defendant upon a white victim." ***Howell***, 860

---

[12]These articles come from the Commercial Dispatch, the Clarion- Ledger of Jackson, MS, the Commercial Appeal of Memphis, TN and Associated Press state and local wire stories.

So. 2d at 719 (emphasis added). Of the articles submitted, only three articles dated from 1998 identify the race of King, none of which identify the race of Patterson. This does not constitute an "inordinate amount" of media coverage. For these reasons, we find no merit in King's argument that the evidence presented at trial created an irrebuttable presumption in favor of a change of venue.

¶29. Furthermore, King did not present any evidence that he could not receive a fair trial from the twelve jurors who heard his case. In *Swann*, this Court held that the State can rebut the presumption that the defendant could not receive a fair trial by proving that the trial court impaneled an impartial jury. *Swann*, 806 So. 2d at 1116. The trial judge instructed the venire not to discuss the case with anyone nor to watch, listen or read anything regarding the case. The trial court subsequently reminded the venire of this instruction and questioned the entire panel as to whether anyone had read, heard or seen anything regarding the case. No venire member responded that he or she had obtained any information about the facts of the case. Furthermore, nearly two years of silence intervened between the news coverage of King's case and the 2003 resentencing trial. The publicity in this case "was not widespread and did not reach massive or epidemic proportions." *Id.* (*citing Box v. State*, 610 So. 2d 1148, 1153 (Miss. 1992)). Based on the evidence in the record, we find that the trial court did not abuse its discretion in denying King's motion for a change of venue.

IV. **WHETHER THE TRIAL COURT ERRED IN DENYING KING'S MOTION TO EXCLUDE THE DEATH PENALTY AS A SENTENCING OPTION BECAUSE KING'S INDICTMENT WAS DEFICIENT**.

¶30.   King argues that, although his indictment identified burglary as the felony that elevated the killing of Mrs. Patterson to capital murder, burglary is unlike any other felony in that it requires an intent to commit another crime as an essential element of the felony. *State v. Berryhill*, 703 So. 2d 250, 256 (Miss. 1997).  Relying on *Berryhill* for support, King claims that his indictment is defective because it does not specify the felony underlying the burglary, and as such, the indictment cannot support a finding of capital murder.  The State counters that under Section 99-39-5(2) of the Mississippi Code, King had three years from the date *Berryhill* was decided to challenge his conviction under the Mississippi Post-Conviction Collateral Relief Act.[13]  However, since King did not challenge the sufficiency of the indictment until he filed a motion to exclude it during his most recent resentencing trial on September 23, 2002, the State argues that this claim is now barred.

¶31.   King was convicted of capital murder on  December 5, 1980.  This Court affirmed King's conviction on October 27, 1982, and the United States Supreme Court denied certiorari on May 2, 1983.  This concern about the indictment was not expressed at any time during King's trial, nor was it raised to the trial court or this Court during King's 1998 resentencing, which occurred after *Berryhill* was decided by this Court.  Further, King did not challenge his conviction on this basis under the Mississippi Post-Conviction Collateral Relief Act.  This claim was not raised until 2002 at King's most recent resentencing trial. Accordingly, we hold that King is barred from raising the matter at this time by virtue of the time bar found in Section 99-39-5(2).

---

[13] Note that at the time *Berryhill* was decided, the statute of limitations for bringing a post-conviction action was three years.

26

**V.  WHETHER THE TRIAL COURT ERRED IN DENYING KING'S MOTION TO EXCLUDE THE DEATH PENALTY BECAUSE OF (A) 22-YEAR INCARCERATION ON DEATH ROW AND (B) UNAVOIDABLE JURY BIAS.**

¶32.    King argues that the trial court should have granted his Motion to Exclude the Death Penalty because he has been on death row for twenty-five years[14] as a result of repeated trial court errors which have substantially prolonged his incarceration.  King argues that serving an excessive period on death row constitutes "cruel and unusual punishment" in violation of his constitutional rights.  Additionally, King argues that the trial court should have granted his motion, as this motion not only established his excessive time on death row, but also unavoidable juror bias resulting from the jurors' knowledge of his prior death sentences.

¶33.    This Court has considered and rejected this argument before. *Wilcher v. State*, 863 So. 2d 776, 834 (Miss. 2003); *Russell v. State*, 849 So. 2d 95, 144-45 (Miss. 2003); *Jordan v. State*, 786 So. 2d 987, 1028 (Miss. 2001).  In *Wilcher*, the defendant asserted that he had been subjected to "cruel and inhuman treatment" in violation of his constitutional rights because he had been kept in maximum confinement on Mississippi's Death Row and had; been subjected to numerous execution dates during a period of nineteen to twenty years. *Wilcher*, 863 So. 2d at 834.  Citing *Jordan v. State*, 786 So. 2d 987, 1028 (Miss. 2001), the *Wilcher* Court stated:

> Jordan argues that he has been incarcerated on death row from the time the crime was committed in this case, in 1976, until 1991, and then again in 1998, when the life sentence was vacated, until now. He claims that he has suffered psychological trauma waiting for his execution and that there is nothing gained

---

[14]The issue presented by King references a "22-year incarceration;" however, in his brief, King states that he has been on death row for 25 years.

27

by the State from 22 years of needless infliction of pain and suffering. He indicates that the United States Supreme Court has held that the death penalty violates the Eighth Amendment when it makes no measurable contribution to acceptable goals of punishment, i.e., retribution and deterrence, and is nothing more than needless imposition of pain and suffering. ***Penry v. Lynaugh***, 492 U.S. 302, 335, 109 S. Ct. 2934, 2956, 106 L. Ed. 2d 256, 289 (1989).

. . . .

There is no precedent which supports Jordan's contention that his Eighth Amendment right against cruel and unusual punishment has been violated. Therefore, there are no grounds for reversal on this issue. ***Jordan v. State***, 786 So. 2d 987, 1028. This Court's language in ***Jordan*** goes to the very heart of the issue presented by Wilcher. *There is no law of the United States or of this state to support Wilcher's claim.*

***Wilcher,*** 863 So. 2d at 834. (Emphasis added). Accordingly, we find this claim devoid of any merit.

¶34. Next, we address King's claim that because his prior death sentence was mentioned before the jury, the trial judge should have declared a mistrial due to unavoidable jury bias. Specifically, King cites three instances to support his allegation of unavoidable jury bias. First, he cites the response of Jane Anderson, Mrs. Patterson's daughter, to a question on direct examination about the impact of her mother's death on her and her family. Anderson responded:

It's been really hard on us because we know what a tragic death she has and it's just been really hard. You know, she loved my son. He was five-years-old and he didn't have a grandmother, so it's been bad on all of us, really bad. Nobody knows until they've gone through something like this. It's been horrible. *Twenty-three years of it is a lot of 23 years over and over and over and over. It's a long time.*

(Emphasis added). King argues that the last sentence of her response made the jury aware of how long King had been incarcerated and awaiting death.

28

¶35. Secondly, King moved for a mistrial after Dr. Robin King's response to a question by the prosecution regarding the criteria for determining malingering, specifically the first criteria of a patient presenting himself in a medical/legal context. Dr. King stated that when he saw King in 1983 or 1984, King was on death row. The judge reserved ruling on the motion until a time when he had read cases concerning oral curatives but nonetheless admonished the jury to disregard the testimony and "any possible inference that you could make from the answer and to disregard that inference that was given by Dr. King." The trial court subsequently denied the motion for mistrial.

¶36. Lastly, King points to Dr. Whelan's testimony in response to a question by the defense that he "pretty regularly saw Mr. King on death row. . ." King objected to Dr. Whelan's response to his own question, which was sustained. The judge instructed the jury to disregard the testimony. King then moved for a mistrial, which was denied by the court. King argues that these statements undoubtedly tainted the jury in its deliberations, arguing that (1) the jury likely assumed the extended lapse of time on death row was somehow King's fault and/or (2) the jury simply deferred to the original jury during both the guilt and sentencing phases or the 1998 jury that resentenced King to death after evaluating the evidence.

¶37. In *Wilcher*, this Court held that Wilcher's claim of jury bias based on comments made during his resentencing did not warrant relief. 697 So. 2d 1087, 1101 (Miss. 1997). To support his argument, Wilcher cited *West v. State*, 463 So. 2d 1048, 1052-53 (Miss. 1985), in which the Court held that the portion of judgments dealing with the death sentence should have been redacted in a manner that the jury could not have read, for the reason that

29

"if the jury knows that the appellant is already under a sentence of death it would tend to relieve them of their separate responsibility to make that determination." *Id*. In distinguishing *West* and finding that Wilcher's claim lacked merit, this Court stated:

> In the case at hand, the jury was not given a copy of the previous judgments or told that Wilcher had previously been sentenced to death. The jury was told that Sid Salter interviewed Wilcher at Parchman's maximum security unit, commonly referred to as "death row." *Salter's comment did not tell the jury that Wilcher was "already under a sentence of death."*
>
> The jury was, however, aware that Wilcher had been convicted of two capital murders. *It is logical that criminals of this nature would be confined in a maximum security area -- regardless of whether they were awaiting execution.* Moreover, the jury was also aware that they were responsible for determining whether Wilcher received the death penalty for killing Noblin. For these reasons, Salter's comment did not relieve the jury of its "separate responsibility to make the determination." *See West*, 463 So. 2d at 1052-53.

*Wilcher*, 697 So.2d at 1102. (Emphasis added). First, nothing in Anderson's testimony mentioned King's time served on death row. She only mentioned "23 years" of dealing with the impact of her mother's death; therefore we find King's claim that this statement made the jury aware of the length of time he had been awaiting execution lacks merit. As such, we find no prejudice to King as a result of Anderson's statement.

¶38. Next, King's argument concerning Dr. King's and Dr. Whelan's statements that they saw King "on death row" also lacks merit for the same reasons set forth by this Court in *Wilcher*. Like the comment in Wilcher's case, the jury was told that Dr. King interviewed King on "death row." Dr. King's comment did not tell the jury that King was "already under a sentence of death." *Id*. Likewise, Dr. Whelan's comment that "he pretty regularly saw Mr. King on death row" did not inform the jury of King's death sentence. Further, the jury was aware that King had been convicted of capital murder. As this Court previously stated, "[i]t

30

is logical that criminals of this nature would be confined in a maximum security area -- regardless of whether they were awaiting execution." *Id.* Additionally, as the jury members were aware of their responsibility for determining whether King received the death penalty for the murder of Patterson, these comments did not relieve the jury of its "separate responsibility to make the determination." *See West*, 463 So. 2d at 1052-53. For these reasons, King's argument fails.

**VI.   WHETHER THE TRIAL COURT ERRED BY STRIKING JURORS BASED UPON THEIR VIEWS OF THE DEATH PENALTY**.

¶39.   King asserts that the trial court violated his Sixth and Fourteenth Amendment right to a trial by an impartial jury when it excused for cause potential jurors who expressed moral convictions against the death penalty. Specifically, King argues that the trial court erroneously excused Shellie Stewart and Barbara Tucker. King relies on United States Supreme Court decision *Wainwright v. Witt* to support his position. 469 U.S. 412, 416 (1985) (holding that a trial court that excuses for cause prospective jurors "who express conscientious objections to capital punishment" violated a criminal defendant's right to a trial by an impartial jury). *Id.* King also relies on *Fuselier v. State*, 468 So. 2d 45, 55 (Miss. 1985), which states "[a]bsent a clear showing that the prospective juror would be unable to follow the court's instructions and obey the juror's oath, that juror's feelings regarding the death penalty do not constitute grounds for a challenge and the granting of such a challenge is reversible error."

¶40.   Shellie Stewart stated on her questionnaire that she "mildly disagreed" with the death penalty, but then marked "no" to the question, "[i]n spite of your feelings. . . could you ever

31

personally vote to impose the Death Penalty?" The prosecutor then questioned Stewart about weighing the aggravating and mitigating circumstances in light of a finding that King had a low I.Q. First, Stewart said that she "would weigh the circumstances" despite finding that "one circumstance [was] that he was of low I.Q." However, when the prosecutor asked, "Are you telling me then that your weighing is always going to come out in favor of life because that one circumstance weighs so heavily in your mind," Stewart responded, "[w]ith that weighing so heavily, possibly, yes." The trial judge excused Stewart for cause.

¶41.   Barbara Tucker contradicted her initial response of "mildly disagreeing" with voting in favor of the death penalty. On her questionnaire, Tucker responded that she could vote to impose the death penalty. However, during voir dire by the court Tucker responded, "I believe I automatically will vote against it, sir" when asked whether she would "follow and apply the law and consider all of the options provided by the jury instructions" or if she would automatically "vote against the death penalty regardless of the facts and the law." During individual voir dire, the prosecutor asked Tucker if he was correct in saying that "[he] understood [her] response to be that [she] would never vote to impose the death penalty," to which she responded, "I said I didn't believe that I could." The prosecutor continued and asked, "[c]an you, Ms. Tucker, can you ever really vote to give somebody the death penalty?" Tucker responded, "[i]t would be hard, very hard. To tell you that I can't, I can't just honestly sit here and tell you that. I can tell you that I know it would be very hard." However, in response to the defense's questioning about her questionnaire where she marked that she " mildly disagreed" with the death penalty, Tucker said, "Yeah, I circled

32

that. Yeah. It's more mildly than strongly." After reviewing cases on strikes for cause dealing with views toward the death penalty, the trial judge excused Tucker for cause.

¶42. The test to determine when a prospective juror's views on the death penalty justify his removal is whether the trial court finds that the "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" thus leaving the trial court "with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt*, 469 U.S. 412, 424-26, 105 S. Ct. 844, 852-53, 83 L. Ed. 2d 841, 851-52 (1985). If the judge is concerned with the response given, he must further determine whether the potential juror could follow the law as instructed even if the juror expressed a general disapproval of the death penalty. *Id.* "[T]his is why deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426.

¶43. The trial judge has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. *Mississippi Winn-Dixie Supermarkets v. Hughes*, 247 Miss. 575, 156 So. 2d 734, 738 (1963). However, it is reversible error if one juror is erroneously excused from the jury on the basis of his view on the death penalty. *Gray v. Mississippi*, 481 U.S. 648, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987).

¶44. In *Dufour v. State*, 453 So. 2d 337, 341-44 (Miss. 1984), potential jurors were excluded who gave contradictory responses, wavered on their position and generally appeared confused regarding the death penalty issue. This Court found no reversible error in the trial court's excluding the potential jurors for cause. *Id.* at 345. This Court also has upheld decisions to exclude jurors based on their inability to provide a consistent answer

regarding their views on the death penalty. *Spicer v. State*, 921 So. 2d 292, 322 (Miss. 2006).

¶45. The record clearly establishes that the trial court excluded Tucker because she repeatedly switched positions as to whether she supported or opposed the death penalty, and gave wavering responses when asked whether she could vote for the death penalty. This Court has previously stated that "[i]t goes without saying that a potential juror who cannot give a straight answer would be very unlikely to follow the law." *King v. State*, 784 So. 2d 884, 888 (Miss. 2001). Therefore, the trial court did not abuse its discretion in excusing this juror. Likewise, we cannot say that the trial court abused its discretion in excusing Stewart for cause. On her jury questionnaire, Stewart responded that she could not vote for the death penalty. Further, the judge had ample opportunity to observe this juror's responses and demeanor during voir dire, which he found sufficient to determine that her feelings toward the death penalty would substantially impair her duties to perform as a juror. For these reasons, we find that the trial court did not abuse its discretion in striking both jurors. Therefore, we find this issue to be without merit.

> **VII. WHETHER THE TRIAL COURT ERRED IN DENYING KING THE OPPORTUNITY TO PRESENT EVIDENCE AND CHALLENGE THE STATE'S EVIDENCE REGARDING THE IDENTITY OF LELA PATTERSON'S ACTUAL KILLER.**

¶46. King asserts that the trial court erred in granting the State's motion in limine, which sought to prevent King from arguing that he did not kill Patterson at trial. King argues that the trial court's reasoning that this argument was tantamount to relitigating the issue of guilt fails because Miss. Code Ann. § 97-3-19(2)(e) permits a person to be convicted of capital

34

murder even if he was only an accomplice to the killing. Therefore, King asserts that his argument that he was not the killer is not the same as making an argument of innocence. Additionally, King submits that evidence that someone other than King killed Patterson is relevant to the mitigating and aggravating circumstances considered by the jury in making its sentencing determination. Further, King argues that his constitutional right against cruel and unusual punishment requires the sentencing determination to be made only after considering any and all evidence regarding the circumstances of his crime, and thus, he was deprived of his constitutional rights when he was precluded from presenting evidence of Patterson's "actual killer."

¶47.    This Court has held that arguing residual doubt concerning a defendant's guilt on resentencing constitutes *res judicata*, and thus is procedurally barred. "Our caselaw holds that in an appeal from a resentencing trial for capital murder, the issue of guilt is res judicata and cannot be relitigated." ***Irving v. State***, 441 So. 2d 846, 851-52 (Miss. 1983). Quoting ***Irving,*** 441 So. 2d at 849, this Court in ***Holland v. State,*** 705 So. 2d 307 (Miss. 1997) stated:

> In that the conviction by the first jury was not disturbed on appeal, the present sentencing jury was prohibited by the doctrine of res judicata from relitigating the issue of guilty (sic). Rather, the second jury's function was to accept the first jury's finding that Irving was guilty of felony-murder involving robbery and then to determine sentence.

***Id.*** at 322-323. This Court held that no residual doubt could be argued since the underlying conviction had already been affirmed on appeal. ***Id.*** Further, the United States Supreme Court, in ***Oregon v. Guzek***, 546 U.S. 517, 126 S. Ct. 1226, 163 L. Ed. 2d 1112, 2006 U.S. LEXIS 1818 (U.S. 2006), held:

35

The Eighth Amendment insists upon "'reliability in the determination that death is the appropriate punishment in a specific case.'" ***Penry***, supra, at 328, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (*quoting* ***Woodson v. North Carolina***, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion)). The Eighth Amendment also insists that a sentencing jury be able "to consider and give effect to mitigating evidence" about the defendant's "character or record or the circumstances of the offense." ***Penry***, supra, at 327-328, 109 S. Ct. 2934, 106 L. Ed. 2d 256. *But the Eighth Amendment does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted. Rather, "States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'"* ***Boyde v. California***, 494 U.S. 370, 377, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990) (*quoting* ***Franklin***, supra, at 181, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (plurality opinion)).

***Id.*** at 525-526. (Emphasis added). The issue in ***Guzek*** was whether Oregon could limit the innocence-related evidence that a defendant sought to introduce at a sentencing proceeding. In holding that the Oregon Supreme Court was wrong in vacating Guzek's sentence for aggravated murder because he had the right to present alibi evidence as "relevant mitigating evidence" in the sentencing proceeding, the Supreme Court stated:

Three circumstances, taken together, convince us that the State possesses the authority to regulate, through exclusion, the evidence that Guzek seeks to present. First, sentencing traditionally concerns how, not whether, a defendant committed the crime. See United States Sentencing Commission, Guidelines Manual § 1A1.1, editorial note, § 4(a), p. 4 (Nov. 2004). But the evidence at issue here – alibi evidence – concerns only whether, not how, he did so.

Second, the parties previously litigated the issue to which the evidence is relevant – whether the defendant committed the basic crime. The evidence thereby attacks a previously determined matter in a proceeding at which, in principle, that matter is not at issue. The law typically discourages collateral attacks of this kind. Cf. ***Allen v. McCurry***, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980) ("As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication").

Third, the negative impact of a rule restricting defendant's ability to introduce new alibi evidence is minimized by the fact that Oregon law gives the defendant the right to present to the sentencing jury all the evidence of innocence from the original trial regardless. That law permits the defendant to introduce at resentencing transcripts and exhibits from his prior trial. Ore. Rev. Stat. § 138.012(2)(b) (2003). The defendant here has not claimed that the evidence at issue was unavailable at the time of his original trial. Thus, he need only have introduced it at that time to guarantee its presentation (albeit through transcripts) to a resentencing jury as well.

*Id.* at 17-19.

¶48.    Therefore, King's argument that he should have been permitted to introduce evidence that he was not Patterson's killer fails.  In light of the Supreme Court's holding in *Guzek* and our holding as to residual doubt in *Holland*, we  find that King cannot make an argument as to his guilt at a resentencing trial.  Accordingly, this issue is procedurally barred from further consideration under the doctrine of *res judicata*. *See* Miss. Code Ann. § 99-39-21(3) (Rev. 2000).

## VIII.  WHETHER THE TRIAL COURT ERRED IN ALLOWING IMPERMISSIBLE VICTIM IMPACT TESTIMONY HIGHLY PREJUDICIAL TO KING AT THE RE-SENTENCING HEARING.

¶49.    King argues that the testimony of Jane Anderson concerning the impact Mrs. Patterson's death had on the family at King's sentencing hearing constituted impermissible testimony.  Following this testimony, King moved for a mistrial, asserting that only a brief glimpse of the victim's life is allowed to be submitted to the jury.  King argued that Anderson's detailed testimony far exceeded this limit.  King submits that the admission of this evidence constitutes reversible error, and that the denial of his motion for mistrial violated his due process rights against the introduction of victim impact statements that are

37

"so unduly prejudicial that it renders the trial fundamentally unfair[.]" ***Payne v. Tennessee***, 501 U.S. 808, 825 (1991). As such, King argues that his sentence should be vacated and remanded for a new sentencing trial.

¶50. The State counters that King's claim should be barred as he failed to make a contemporaneous objection during her testimony regarding any "victim impact" evidence. The State argues that since King made no objection during the testimony but then moved for a mistrial immediately after Anderson left the stand, King is attempting to invite error by allowing this testimony and moving for a mistrial only *after* it was before the jury. While still asserting the procedural bar, the State further submits that King's claim is without merit because Anderson's testimony was not objectionable. Citing ***Havard v. State***, 928 So. 2d 771 (Miss. 2006), the State argues that this victim impact evidence was admissible, and therefore, the trial court did not err in overruling King's motion for mistrial. On direct examination, the State asked Anderson what impact her mother's death had on her family's life, to which she replied:

> Well, it's been really horrible. It's hard to talk about. (Witness crying). You know, I think about her a lot. We have this on our mind all the time. Every birthday that comes around, you think about her. Mother's Day, especially, you think about your mother. It's been really hard on us because we know what a tragic death she has and it's just been really hard. You know, she loved my son. He was five-years-old and he didn't have a grandmother, so it's been bad on all of us, really bad. Nobody knows until they've gone through something like this. It's been horrible. Twenty-three years of it is a lot of 23 years over and over and over and over. It's a long time.

This Court recently addressed the admission of victim impact testimony in a death penalty case in ***Havard v. State***, 928 So. 2d 771 (Miss. 2006). In discussing the victim's

grandmother's statement that "[j]ustice means [Chloe's] life was taken, and there is only one way that we can find justice for [Chloe]. A life for a life," we stated:

> Victim impact evidence is admissible at sentencing, though not at the culpability phase of trial. ***Payne v. U.S.***, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991). We have allowed such evidence, recognizing that Payne only laid out what was constitutionally permitted, but not necessarily mandatory. ***Hansen***, 592 So. 2d at 146-47. "Victim impact evidence, if relevant, is admissible in the sentencing stage." ***Wilcher v. State***, 697 So. 2d 1087, 1104 (Miss. 1997). As it is constitutionally permissible, this Court will allow such testimony, when relevant, in narrow circumstances. ***Branch[v. State]***, 882 So. 2d [36] at 67 [(Miss. 2006)]. "The evidence offered was proper and necessary to a development of the case and true characteristics of the victim and could not serve in any way to incite the jury." ***Jenkins v. State***, 607 So. 2d 1171, 1183 (Miss. 1992). We have also allowed the opinions of the victim's family members as to the crimes and the defendant as permissible victim impact testimony. *See **Wells v. State***, 698 So. 2d 497, 512 (Miss. 1997). *In the testimony that Watson gave at sentencing, she also made clear that she was not seeking revenge and did not consider herself a vengeful person. Her entire testimony, taken in context, was not designed to incite the jury. The vast majority of her testimony went straight to the relationships between her family members, including Chloe, and the impact losing Chloe had on them, all part of permissible testimony under our case law. See **Edwards v. State***, 737 So. 2d 275, 290-91 (Miss. 1999).

***Havard***, 928 So. 2d at 791-792 (emphasis added). Anderson's testimony falls within the guidelines for permissible testimony set forth in ***Havard*** and ***Edwards***. Her testimony was not designed to incite the jury but described the impact that losing her mother had on her family. Finding Anderson's testimony to be permissible, we determined that this issue is devoid of any merit.

> **IX. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE AGGRAVATOR "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL," AND WHETHER THERE WAS INSUFFICIENT EVIDENCE OF THE AGGRAVATOR, IN VIOLATION OF THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS AND THIS COURT'S SPECIFIC MANDATE.**

¶51.   King argues that the trial court ignored this Court's express instruction that the trial court use the precise language of an approved instruction from *Edwards* on remand. *King v. State*, 784 So. 2d 884, 890-892 (Miss. 2001).   King's counsel objected to the State's instruction, noting that counsel proposed the instruction that this Court directed the trial court to use; however, the trial court granted the State's instruction.   In King's last appeal, this Court stated:

> This Court has approved the following "exact narrowing instruction on the heinous, atrocious, cruel aggravator":
>
>> The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others. An especially heinous, atrocious or cruel capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders-the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental pain before death, that there was mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.
>
> *Edwards v. State*, 737 So. 2d 275, 315 (Miss. 1999).
>
> *The instruction this Court has approved requires, at a minimum, that the offense be a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." Id.* The instruction the trial court approved is different in that it uses the disjunction "or" rather than "and" or "which is" to precede "unnecessarily torturous." The effect is to simply substitute the words "conscienceless, pitiless, or unnecessarily torturous" for the words "heinous, atrocious or cruel."

40

King argues that if "an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous'," so too could an ordinary person believe that every unjustified, intentional taking of human life is "conscienceless" or "pitiless." King insists that the words "conscienceless" or "pitiless" no more limit a jury's discretion than the words, "heinous, atrocious or cruel." With no limiting effect on the jury's discretion, King argues, the trial court's instruction is unconstitutionally vague.

The State contends that while the language here is somewhat different than that usually given the jury, this is still an acceptable definition of this aggravating circumstance. The State argues that there is no magic language that is required to define this aggravating circumstance.

The definition which we have previously established as an acceptable instruction is certainly not the only acceptable instruction. It remains, however, the only definition which we have approved and which has explicitly been found to pass constitutional muster. *Whether the instruction used in the case sub judice is acceptable in light of the previously-approved instruction is a close call. Departing from the tried and true trail is fraught with danger. Therefore, on remand, the precise language of the previously-approved instruction should be used.*

*King,* 784 So. 2d at 890-892. (Emphasis added).  However, at King's resentencing. the trial court gave the following instruction:

The Court instructs the jury that an especially heinous, atrocious, or cruel murder is one accompanied by such additional acts as to set the homicide apart from other murders; a conscienceless or pitiless crime which is unnecessarily torturous to the victim.

¶52.     This Court has affirmed, at a minimum, that the instruction on the HAC aggravator defines an "especially heinous, atrocious or cruel" offense as "a conscienceless or pitiless crime which is unnecessarily torturous to the victim."  *Id*; *Edwards*, 737 So. 2d at 315; *Manning*, 735 So. 2d 323, 349 (Miss. 1999).   Further, the United States Supreme Court, in *Bell v. Cone*, 543 U.S. 447, 458, 125 S.Ct. 847, 854-855, 160 L.Ed.2d 881, 893 (2005), held that this narrowing construction was not unconstitutionally vague.  Therefore, we find that the

instruction given by the trial court conforms to the minimum standard. However, we caution trial courts on remand from giving different instructions other than the specific one that this Court has directed the court to use. Accordingly, while we find the trial court should not have disregarded our instruction, we do not find it requires reversal, because a proper instruction approved by the Supreme Court and this Court was given.

¶53. Next, King asserts that there was insufficient evidence to support the HAC aggravator instruction, as the State failed to present evidence of torturousness to show that his crime rose to the level that set it apart as "heinous, atrocious or cruel" from other murders. Specifically, King argues that the evidence at best was unclear that Patterson suffered extended or torturous suffering before losing consciousness.

¶54. However, King's argument is not supported by the evidence. This Court has held that "[t]he number of wounds, the number of lethal weapons used to inflict these wounds, and the fact that death was not immediate, but prolonged" may all be considered as evidence supporting a jury's finding of the HAC aggravator. *Manning*, 735 So. 2d at 349 (*quoting Davis v. State*, 684 So. 2d 643, 662 (Miss. 1996)). Dr. Martin testified that Mrs. Patterson's death could be attributed to either manual strangulation, a blow to the head, or drowning. He further testified that Patterson suffered multiple bruises about her neck, face, and arms, blunt trauma to her head, and that she aspirated water into her lungs, causing significant cellular damage and edema. While he could not specify the order in which the events occurred, he testified that if Patterson received the head trauma first, she could have been completely aware of her surroundings during the strangulation and immersion of her head. However on cross-examination, he testified that it was possible that she was unconscious during the strangulation

42

and drowning. This Court has rejected the notion that the victim's "ability to remain conscious" after sustaining the lethal wounds has any relevance to this issue. *Manning*, 735 So. 2d at 349-350 (Miss. 1999) (*citing Underwood,* 708 So. 2d at 39). We find that the HAC aggravator was properly presented to the jury, as it was sufficiently supported by the evidence in this case.

## X. JURY INSTRUCTIONS.

¶55. This Court reviews jury instructions as a whole. *Splain v. Hines*, 609 So. 2d 1234, 1239 (Miss. 1992). Defects in particular instructions do not require reversal, when the instructions taken as a whole, fairly express the primary rules of law. *Id.* Further, this Court has held that where a jury is adequately instructed on reasonable doubt, there is no reversible error for the court to refuse to give a defense instruction on it. *Howard v. State*, 853 So. 2d 781, 791 (Miss. 2003) (citing *Holloway v. State*, 809 So. 2d 598, 606 (Miss. 2000)).

### A. Instructions, DSP-1, DSP-3 and SSP-4A

¶56. Citing *Leatherwood v. State*, 435 So. 2d 645, 650 (Miss. 1983), King asserts that the trial court erred in refusing jury instructions DSP-1 and DSP-3, which would have instructed the jury that they could choose to sentence a defendant to life in prison even if aggravating circumstances outweigh the mitigating circumstances or in the absence of any mitigating circumstances. Additionally, King argues that the Jury Instruction SSP-4A misled the jury that the death sentence is mandatory if the aggravating circumstances outweigh the mitigating circumstance. While King concedes that trial courts may refuse mercy instructions, he argues that the trial court's failure to do so in this case was erroneous because it also gave confusing instructions which failed to properly instruct the jury about the weighing process.

¶57. DSP-1 instructed the jury as to the steps to follow in determining whether King should be sentenced to death, life in prison without a possibility of parole or life in prison. DSP-1 stated that "[a] mitigating circumstance is one that does not excuse the crime but which, in fairness, *sympathy and mercy*, you should consider as a reason to impose the less severe penalty of life in prison or life in prison with the possibility of parole." (Emphasis added). DSP-1 further instructed the jury that they were not required automatically to impose the death penalty even if they found that the aggravating circumstances outweighed the mitigating circumstances or if they did not find any mitigating circumstances. In a single instruction, DSP-3 used this exact language from DSP-1 to instruct the jury that they were not required to impose death penalty despite a finding that the aggravating circumstances outweighed the mitigating circumstances or no mitigating circumstances existed. DSP-3 further instructs the jury that they could still conclude "that out of *mercy* the defendant should be sentenced to life imprisonment or life in prison without possibility of parole." (Emphasis added).

¶58. In King's last appeal, this Court held that while each side may argue its respective position on the death penalty in closing argument during the sentencing phase, "neither side is entitled to a jury instruction regarding mercy or deterrence." *King,* 784 So. 2d at 890. We further held that "[t]o the extent that our holding is contrary to previous case law on the subject, those cases are expressly overruled." *Id.* We have on numerous occasions held that a capital defendant is not entitled to a mercy or sympathy instruction. *See Howell v. State*, 860 So. 2d 704, 758-59 (Miss. 2003); *Edwards v. State*, 737 So. 2d 275, 317 (Miss. 1999); *Jordan v. State*, 728 So. 2d 1088, 1099 (Miss. 1998). Further, "[t]he United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could induce

44

a jury to base its sentencing decision upon emotion, whim, and caprice instead of upon the evidence presented at trial." *Howell*, 860 So. 2d at 759 (citing *Saffle v. Parks*, 494 U.S. 484, 492-95, 110 S. Ct. 1257, 1262-64, 108 L. Ed. 2d 415 (1990)). In *Howell*, we upheld the trial court's refusal of an instruction[15] that included nearly the exact language found in DSP-1. Further, a defendant is not entitled to an instruction that the jury may return a life sentence even if the aggravating circumstances outweigh the mitigating circumstances or if they do not find any mitigating circumstances. *Holland v. State*, 705 So. 2d 307, 354 (Miss. 1997), *Hansen v. State*, 592 So. 2d 114, 150 (Miss. 1991), *Goodin v. State*, 787 So. 2d 639, 657 (Miss. 2001), *Foster v. State*, 639 So. 2d 1263, 1301 (Miss. 1994).

¶59. Additionally, DSP-1 contained the language, "If, after reasonable deliberations, you cannot agree on a judgment, you should certify this disagreement to the Court and the Court shall impose a sentence of life imprisonment. . . ." This Court has held that a defendant is not entitled to this type of instruction. *See Smith v. State*, 729 So. 2d 1191, 1221 (Miss. 1998). Accordingly, we find that the trial court did not committed reversible error in refusing jury instructions DSP-1 and DSP-3.

¶60. Instruction SSP-4A stated, "[i]f, after weighing the mitigating and aggravating circumstances, you find unanimously that the mitigating circumstances do not outweigh the aggravating circumstances, *and that the death penalty should be imposed,* your verdict should

---

[15] "A mitigating circumstance is a fact which does not excuse the crime but which, in fairness and in mercy, you should consider as a reason to impose a sentence of life imprisonment rather than death."*Howell*, 860 So.2d at 758.

be returned on a separate sheet of paper." (Emphasis added). The instruction gave the following form for returning the verdict:

¶61. "We, the Jury, further unanimously find that after weighing the mitigating circumstances and aggravating circumstances, that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death." King argues that the instruction did not denote that the phrase "and that the death penalty should be imposed" was an independent determination in addition to the weighing process. Instead, he asserts that it indicated that the death penalty automatically followed a finding that the mitigating circumstances did not outweigh the aggravating ones. We are not persuaded by this argument, as this phrase is separated in the sentence with commas, following the language " after weighing the mitigating and aggravating circumstances," pointing out that the jurors are required to make a decision as to the sentence only after they have weighed the circumstances.

¶62. Further, in *Manning v. State*, 726 So. 2d 1152, 1197 (Miss. 1998) (*overruled on other grounds*), this Court addressed a similar instruction which also included the phrase "and that the death penalty should be imposed." With regard to this phrase, this Court held that "[t]his part of the instruction makes it clear that the finding that the death penalty should be imposed is a separate decision to be made from the weighing of aggravators and mitigators." *Id.* As such, this Court held that this instruction instructed the jury that it could return a life sentence even in the absence of mitigators, therefore there is no requirement that the jury be instructed that it has the power to vote for life imprisonment even if the mitigating circumstances do not outweigh the aggravating circumstances. *Id.* A careful review of SSP-4A reveals no error on

46

the part of the trial court in giving this instruction. Accordingly, we find no merit to King's

claim.

### B. Instructions to Find An *Enmund* Factor

¶63. King argues that the trial court should have imposed a life sentence due to the jury's

failure to return a verdict that did not find any of the *Enmund* factors. King asserts that the

May 29, 2007 court erred in finding that the jurors' verdict was deficient only in "form" and

not in substance and in overruling his counsel's objections and motion for mistrial. A review

of the record reveals that the jury did return a verdict containing no findings of any of the

factors found in Miss. Code Ann. Section 99-19-101 (7), which King refers to as the "*Enmund*

factors."[16] After the State brought this to the trial court's attention, the trial court held a

conference regarding this matter outside the presence of the jury. Following the conference,

the court read the following instruction to the jury:

> The Court instructs the Jury that the verdict you have returned to the Court does
> not completely conform to the form of the verdict as presented to you by the
> instructions of the Court. The Court instructs you to direct your attention to
> instruction number SSP-4A and to return your verdict, if you can, in a form
> consistent with your findings as required by instruction number SSP-4A and the
> other instructions of the Court. Please continue your deliberations.

When the jury returned from further deliberations, they returned a verdict of death in the

proper form.[17] We have previously held that a judge may instruct the jury to return to

---

[16] A jury must find that the defendant committed the killing, attempted the killing, intended the killing, or contemplated the killing, to levy a death sentence. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Miss. Code Ann. § 99-19-101(7)(Rev. 2000).

[17] The second form is identical to the first form with the addition of the following: "We, the Jury, unanimously find beyond a reasonable doubt that the defendant actually killed."

deliberations and re-examine the instructions in order to return a verdict in the proper form.

In *Taylor v. State*, 672 So. 2d 1246 (Miss. 1996), the jury returned a verdict inconsistent with the form given in the jury instruction, as the jury did not make a specific finding as to the presence or absence of aggravating factors. The judge addressed the jury as follows:

> I understand the form of your verdict, but I am not sure that it reads completely as the Court would require to clearly establish your finding in the second, Part B of the instruction. If it is the decision of the jury, then the "whether" should be changed to the form that the jury finds "that there is." You will need to return to the jury room and remove the word "whether" and make the instruction state where "there is," so that it will be clear that you are making those findings. If you will give them this and let's return to the jury room.

*Id.* at 1274. In response to the defendant's contention that "the oral instruction amounted to a direction to the jury to find aggravating circumstances," this Court held that "the only question is that of whether or not the trial judge in his oral instruction to the jury said anything which would taint the verdict." *Id.* The Court further held because the jury had the instruction with them, and the court directed the jury to re-form the verdict "if it is the decision of the jury," there was no error. *Id.* Likewise, we find that the instruction given here by the trial court did not taint the verdict. The judge did not give the jury any specific instructions to find an *Edmund* factor as King suggests. The judge merely asked the jury "to return your verdict, *if you can*, in a form consistent with your findings as required by instruction number SSP-4A." (Emphasis added). Accordingly, we find no error.

## C. "Avoiding Arrest" Aggravator

¶64. King argues that it was error to submit to the jury an instruction on the "avoiding arrest" aggravator because there was insufficient evidence to support that instruction. King asserts that the State's attempt to prove the aggravator with evidence that King lied to the police about his whereabouts the night of Patterson's death fails because this instruction is appropriate only where the substantial reason for killing was to conceal one's identity and thus avoid arrest for a different crime, not where the defendant attempted to avoid arrest *after* the murder. *Holland*, 705 So. 2d at 355-56. Since the jury was not instructed on the "avoiding arrest" aggravator at either his 1980 or 1998 resentencing hearing, King argues that the State cannot "improve its position" by asserting an aggravating circumstance which it failed to assert during the previous sentencing hearings. Citing *Doss v. State*, 882 So. 2d 176, 195 (Miss. 2004), the State counters that there appears to be no other motive to kill Patterson, except the desire to eliminate witnesses.

¶65. The standard for reviewing the sufficiency of the evidence to support the "avoiding arrest" aggravator has been stated as follows:

> Each case must be decided on its own peculiar facts. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

*Grayson v. State*, 879 So. 2d 1008, 1023 (Miss. 2004) (*quoting Wiley v. State*, 750 So. 2d 1193, 1206 (Miss. 1999)). This Court has held that lying to the police does not by itself constitute evidence that a murder was committed to avoid arrest. *Taylor*, 672 So. 2d at 1275. While there is evidence that King initially lied to the police about his whereabouts the night

49

of Patterson's death, there is also evidence from which a jury could infer that King intended to leave Patterson's home without detection so as to avoid arrest.

¶66. First, King admitted to burglarizing Patterson's home.[18] Further, King admitted that he knew Patterson. In his statement, he admitted that he chose Saturday to break into her house because he knew she went over to her daughter's house sometimes. He stated that after entering Patterson's home, he checked to see where she was and saw her in the front bedroom. He admitted that he knew that she was hard of hearing because she told him so before. He further stated that he knew she always wore glasses but did not know her sight was bad. Therefore, it is reasonable that the jury inferred from the fact that Patterson could identify King, he needed to conceal his identity as the burglar of her home. The jury could have inferred that King killed Patterson to avoid detection based on the fact that he chose the day to break in her home based on a time when he thought she might not be there. Additionally, evidence shows that the telephone wires were pulled from their connection on the outside of her home.[19] Therefore, the jury may have inferred that King did so to avoid detection, leaving Patterson unable to call for help. Based on these facts, we find that the jury may reasonably have inferred that a substantial reason that King killed Patterson was either to conceal his identity or to avoid detection and eventual arrest. We find that the trial court did not err in giving this instruction.

### D. Accomplice Mitigating Factor

---

[18] This admission in King's statement, which was read at his resentencing trial, is located in the original record. Further, this is not disputed by either party. *See also* ***King v. State***, 421 So. 2d 1009, 1010-1011 (Miss. 1982).

[19] However, King did not admit to pulling the wires.

¶67.    King submits that the trial court erred in refusing to instruct the jury on the potential mitigating circumstance that he was only "an accomplice in the capital offense committed by another person," based on his assertion that his uncle, Willie Porter, played a role in the crime. King argues that this refusal was clearly erroneous as this circumstance is a statutory mitigator under Miss. Code Ann. § 99-19-101(6)(d) (Rev. 2000).

¶68.    Section 99-19-101(6)(d) lists one mitigating circumstance as: "[t]he defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor." However, as we discussed earlier in this opinion, King was not entitled to an instruction on residual doubt as to his guilt at his resentencing trial. *See supra* Issue VII. Therefore, as this case was before the trial court for the sole purpose of sentencing, the trial court properly refused this instruction which pertained to the question of King's guilt in a killing for which he had already been convicted. Additionally, Part 2 (j) of Instruction SSP-4A lists "[a]ny other circumstances which you deem mitigating" as one of the mitigating circumstances that the jury could have found to exist. Further, King's statement was read at trial, in which he implicated Willie Porter in the burglary and stated that he saw Porter go into Patterson's house as he was leaving. As the jury was allowed to hear this evidence, if they so determined, they could have found this to be a mitigating circumstance under (j). Accordingly, we find no merit in this issue.

### E.  DSP-19

¶69.    King argues that the trial court erred in refusing to give jury instruction DSP-19, which required that the State's evidence be strong enough "to exclude every other reasonable hypothesis, or supposition" and that "facts or circumstances in this case acceptable to two

51

reasonable interpretations" be resolved in the defendant's favor, because the State's case rested entirely on circumstantial evidence. King argues that while he confessed to the burglary, he did not confess to Patterson's killing or any of the facts supporting the HAC and "avoiding arrest" aggravators. Therefore, King argues that the jury's finding of those aggravators could have been based only on inferences from circumstantial evidence, amounting to reversible error by the trial court in refusing to give instruction DSP-19. The State submits that this case is not entirely circumstantial, as King's admission to being in Patterson's home and burglarizing it took this case out of the realm of pure circumstance.

¶70.    In *Lynch v. State*, 877 So. 2d 1254, 1268 (Miss. 2004), this Court discussed the issue of whether circumstantial evidence language is required in a sentencing instruction. This Court held that:

> [I]t is true that in circumstantial evidence cases the state must prove the defendant's guilt beyond a reasonable doubt and to the exclusion of every other hypothesis consistent with innocence. *See*, *Jones*, 797 So. 2d at 927; *Henderson*, 453 So. 2d at 710; *Jackson v. State*, 684 So. 2d 1213, 1229 (Miss. 1996) (*quoting Isaac v. State*, 645 So. 2d 903, 909 n.7 (Miss. 1994)). However, this Court has never held that circumstantial evidence language is required in charging the jury as to the requirements of Miss. Code Ann. § 99-19-101(7).
>
> In order to impose the death penalty, a Mississippi jury must make a written finding of one or more of the following factors:
>
> (a) The defendant actually killed;
> (b) The defendant attempted to kill;
> (c) The defendant intended that a killing take place;
> (d) The defendant contemplated that lethal force would be employed.
>
> . . . .
>
> [W]e conclude that the jury instruction is not clearly erroneous because it comports with the requirements of Miss. Code Ann. § 99-19-101(7) and this

52

Court's jurisprudence regarding the State's burden of proof as to the elements set out in the statute.

*Id.* As we previously discussed, Instruction SSP-4A properly set out the requirements under Miss. Code Ann. § 99-19-101(7)(Rev. 2000). *See supra* Issue X(A). Further, the jury's finding that King actually killed Patterson indicates its rejection of any other reasonable hypothesis of his participation in the crime. Therefore, King's argument that he was entitled to DSP-19 based on the circumstantial evidence as to whether he killed Patterson is without merit. Further, we have already found the trial court did not err in giving the instructions on the HAC or "avoiding arrest" aggravators, as these were sufficiently supported by the evidence. *See supra* Issues IX and X(C). Accordingly, we find this issue devoid of merit.

## XI. CUMULATIVE ERROR.

¶71. King argues that the aggregate of errors in this case requires reversal of his death sentence. This Court's review of death penalty cases takes into account the aggregate effect of the variety of errors that appear in a capital sentencing trial. *Flowers v. State*, 842 So. 2d 531 (Miss. 2003). This Court may reverse a sentence based upon the cumulative effect of errors that, by themselves, do not independently require a reversal. *Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss. 1992). A review of the record, the briefs, and the arguments shows that there were no individual errors which required reversal and that there is no aggregate collection of minor errors that would, as a whole, mandate a reversal of either the conviction or sentence. Therefore, this issue is without merit.

## XII. WHETHER THE IMPOSITION OF THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE.

53

¶72.    Miss. Code Ann. § 99-19-105(3) requires this Court to perform a proportionality review

when affirming a death sentence in a capital case, providing:

> (3) With regard to the sentence, the court shall determine:
>
> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶73.    King cites no cases that show that the death sentence is disproportionate in this case.

After reviewing the record in this appeal as well as similar death penalty cases, we conclude

that King's death sentence was not imposed under the influence of passion, prejudice, or any

other arbitrary factor. We also find that the evidence is more than sufficient to support the

jury's finding of statutory aggravating circumstances. Further, upon comparison to other

factually similar cases where the death sentence was imposed, the sentence of death is neither

excessive nor disproportionate in this case. Finally, we find that the jury did not consider any

invalid aggravating circumstances.

## CONCLUSION

¶74. Based on the foregoing reasons, the death sentence imposed by the judgment of the Lowndes County Circuit Court is affirmed.

¶75. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**WALLER, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. EASLEY AND LAMAR, JJ., NOT PARTICIPATING.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶76. As the majority recognizes, once a defendant presents evidence of mental retardation in compliance with our holding in ***Chase***, he is entitled to an ***Atkins*** hearing. ***Chase v. State***, 873 So. 2d 1013, 1029 (Miss. 2004). The trial court must then make a factual determination and "shall place in the record its finding and the factual basis therefor." ***Id.*** While the majority acknowledges that King presented sufficient evidence of mental retardation to receive an ***Atkins*** hearing, it erroneously concludes (1) that the trial court found King was not mentally retarded *after* an evidentiary hearing and (2) that the trial court properly considered all of the evidence before determining that King was not mentally retarded. For these reasons, I must respectfully dissent.

¶77. The majority states, "[h]ere both sides presented expert testimony and other evidence regarding King's mental retardation claim. After hearing all the evidence, which was substantial, the trial judge outlined the evidence that he had considered and gave his reasons for concluding that King was not mentally retarded." While there was evidence of mental retardation presented during his re-sentencing hearing, the trial judge concluded that King

55

was not mentally retarded *prior* to the trial. The ruling took place in chambers, following brief oral arguments, and without a full evidentiary hearing. During this proceeding, no witnesses were called to testify. Furthermore, although the majority suggests otherwise, the testimony of Jessie Brooks, Sammy Townsend, and Ethel Conner was not before the court at this time.

¶78.    Following oral argument in chambers, the trial judge found that King was not mentally retarded based on a 1971 report-card comment from a school teacher. The factual basis for the trial court's finding was as follows:

> From what I can find and what I see, you know, it's an amazing thing sometimes when you look through these records and – of course, I'm married to a retired school teacher and these school teachers sometimes are real observant and it amazes me what they glean sometimes. We have all this testimony from psychologists and we have a psychiatrist report and all these things, and on one of the reports, one of the teachers made a permanent record and said, "Mack Arthur missed almost half of the days. I see no reason to retain. He could do his work if he attended regularly." Now, to me, that teacher was saying, and this was back in '71 and it is something to kind of reach down and have some meaning to me, that what she was saying was this child, if he were in school, he has the ability to learn. She didn't say, you know, that he had a high ability to learn or whatever, but she indicates to me that she was saying if he attended school on a regular basis, if he were here for his classes, he would be all right. I put some weight on that. Y'all might say of all things, but that had some meaning to me.
>
> . . . .
>
> So the Court being required to make a finding as to retardation before we go forward, and I'm not saying this is the last time this could be addressed, but I think it's something that has conditioned precedent to us going on with the trial, and I'm going to define that he is not mentally retarded under Atkins and we will bore ahead. Okay?

The trial court never made additional findings on the ***Atkins*** issue.

¶79. While a teacher evaluation could be relevant to an *Atkins* determination, our prior case law is clear that this is an insufficient basis for determining mental retardation. *See Chase*, 873 So. 2d at 1020 (requiring expert opinion for proof of mental retardation). King presented substantial evidence from mental health experts, but there is no evidence in the record that the trial judge based his ruling on these experts' opinions. Moreover, none of these experts testified before the trial judge entered his ruling.

¶80. In light of our heightened standard of review for capital cases, I cannot join the majority's holding that King was afforded a proper *Atkins* hearing or that the trial judge considered all relevant evidence. "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." *Neal v. State*, 451 So. 2d 743, 750 (Miss. 1984) (quoting *Furman v. Georgia*, 408 U.S. 238, 306, 92 S. Ct. 2726, 2760, 33 L. Ed. 2d 346, 388 (1972), Stewart, J., concurring)).

¶81. For the foregoing reasons, I would reverse King's sentence of death and remand for an *Atkins* hearing.

**GRAVES, J., JOINS THIS OPINION.**

# APPENDIX

# DEATH CASES AFFIRMED BY THIS COURT

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

*Howell v. State,* 860 So. 2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*,  800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

**DEATH CASES AFFIRMED BY THIS COURT**

**(continued)**

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).    *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*__Shell v. State__*, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*__Pinkney v. State__*, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*__Clemons v. State__*, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*__Jones v. State__*, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).
\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE

*Ross v. State,* — So.2d — (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

**DEATH CASES REVERSED AS TO GUILT PHASE
AND SENTENCE PHASE**

**(continued)**

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## ON SENTENCING PHASE ONLY

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

 *Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.